**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FREDY M. THOMAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 7856** |
| | ) | |
| **LOUIS DeJOY,[1] Postmaster General** | ) | **Judge Rebecca R. Pallmeyer** |
| **of the United States Postal Service,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Fredy Thomas has worked for the United States Postal Service ("USPS") at its Carol Stream, Illinois facilities since 1994. In 2017, Thomas—an Asian man of Indian descent—applied for three separate managerial positions but was rejected for all three in favor of Black women whom he believes were less qualified than he for the promotions. In this lawsuit, Thomas asserts claims of discrimination on the bases of race and national origin against Defendant Louis DeJoy, Postmaster General of the United States Postal Service ("Defendant USPS"). Defendant has moved for summary judgment, contending it had non-discriminatory reasons for all three promotion decisions. For the reasons set forth below, Defendant's motion is granted.

<u>**BACKGROUND**</u>

The USPS's Carol Stream facilities function 24 hours a day, seven days a week, to sort mail for residents and businesses in and around Chicago. (Def.'s 56.1 [34] ¶ 1.) The facilities' hundreds of employees are assigned to one of three shifts, known as "tours." (*Id.*) On each tour, a manager of distribution operations ("MDO") manages about a dozen supervisors of distribution operations ("SDO") and up to 150 front-line employees. (*Id.* ¶ 2.) An SDO can also serve as the designated "backup MDO" for their respective tour. When the actual MDO (or "titled" MDO) is out

---

1.     Louis DeJoy has been substituted for his predecessor, Megan J. Brennan. *See* FED. R. CIV. P. 25(d).

of the office, the backup MDO steps into the role of "acting MDO" until the titled MDO returns. (Pl.'s Decl., Ex. 1 to Pl.'s Statement of Additional Facts [47-1] (hereinafter "Pl.'s Decl."), ¶ 3; Thomas Dep., Ex. 1 to Def.'s 56.1 [34-1] (hereinafter "Thomas Dep."), at 79:7–80:18.)

This case arises out of three separate job postings for positions as a full-time, titled MDO at the Carol Stream sorting facility: Posting NB10112627 ("Job Posting 1"), Posting NB10117653 ("Job Posting 2"), and Posting NB101167390 ("Job Posting 3"). (Pl.'s Statement of Additional Facts [47] (hereinafter "Pl.'s SOAF"), ¶¶ 4, 28, 36.) Plaintiff Thomas is an Asian man of Indian descent who applied for all three positions. (Id.; Pl.'s Decl. ¶ 2.) At the time of his applications, Thomas was an SDO with a Level 17 seniority level who had served as the designated backup MDO from June 2015 through September 2017, filling in as an acting MDO as needed. (Def.'s 56.1 ¶¶ 8, 19; Pl.'s Decl. ¶¶ 3–4.) Before he began serving as backup MDO, Thomas asserts, he "did not receive proper training like other non-Asian, Indian [backup] MDOs." (Pl.'s Decl. ¶ 4.) According to Thomas, "usually the MDOs train you to be an acting MDO when you are a [SDO]," (Thomas Dep. at 76:25–77:3), and "usually when they train [SDOs to become acting] MDOs, they have them on the floor [and] show them what they need to do . . . while they are acting MDO." (Id. at 76:6–18.) Thomas also testified that, in 2011, when he requested training from then-MDO Jeff Wisner, Wisner did not train him and, instead, trained a man of his own ethnic background named David Dittman. (Id. at 75:18–76:18.) Thomas does not say whether it was standard practice for all backup MDOs to receive training, nor has he suggested that being denied training was a factor in the non-promotion decisions challenged in this case, described below.

When a full-time MDO position becomes available, a selecting official, with the assistance of a three-member hiring committee, determines who will be promoted to that position. (Pl.'s SOAF ¶ 1; Employment and Placement Handbook, Ex. 7 to Pl.'s SOAF [47-7] (hereinafter "EAP Handbook"), at 8.) The USPS lists internal vacancies on an online "eCareer" system, and employees apply for those vacancies on the same platform. (EAP Handbook at 3, 13; Job Posting 1, Ex. 2 to Pl.'s SOAF [47-2] (hereinafter "Job Posting 1"), at 3.) Once applications have been

submitted, the hiring committee collectively gives each application a score of 0, 1, or 2 in each of eight separate categories of Knowledge/Skill/Ability qualifications ("KSAs").[2] (Pl.'s SOAF ¶ 1; EAP Handbook at 4.) An application is immediately rejected without an interview if the applicant receives a zero on any KSA. (Pl.'s SOAF ¶ 1.) Among applicants who score one or higher on every KSA, the review committee recommends three to five individuals to be interviewed. (*Id.*) The selecting official chooses who to promote from among the interviewed applicants. (*Id.*)

## A.    Job Posting 1

On May 23, 2017, Thomas applied for Job Posting 1: a seniority-level 22 MDO position at Carol Stream. (*Id.* ¶ 4.) The hiring committee for this position consisted of manager of in-plant support Doug St. John and MDOs Katina Powe and Janina Gilbert. (Def.'s 56.1 ¶ 20; Pl.'s SOAF ¶ 9.) St. John served as committee chair. (Def.'s 56.1 ¶ 20.) The hiring committee gave Thomas a zero in two KSA categories: KSA 4 – "Ability to communicate orally . . . . ," and KSA 7 – "Ability to manage an on-the-job training program."[3] (Job Posting 1 at 3, 5.) For that reason, Thomas was not interviewed for this posting. (*See* Pl.'s SOAF ¶ 35.) Instead, the position was awarded to Bernadette Binkley, a Black woman of American origin who had received a perfect score of two on all eight KSAs. (*Id.* ¶ 16.) While Thomas was an SDO at seniority level 17 (Def.'s 56.1 ¶ 19), Binkley was already a Level 20 titled MDO when she applied for the Level 22 MDO position. (*Id.* ¶ 22 (citing Powe Dep., Ex. 4 to Def.'s 56.1 [34-4] (hereinafter "Powe Dep."), at 61:4–17; Pl.'s SOAF ¶ 19).)

---

[2]    The EAP Handbook states that KSAs are graded on a scale of zero to three. (EAP Handbook at 4.) Here, however, both sides agreed that KSAs were graded on a scale of zero to two (Def.'s Resp. to Pl.'s SOAF [50] ¶ 1), and the hiring committee awarded only scores of 0, 1, and 2 to applicants for each of the three job postings. (Job Posting 1 at 5; Job Posting 2, Ex. 3 to Pl.'s SOAF [47-3] (hereinafter "Job Posting 2"), at 5; Job Posting 3, Ex. 10 to Pl.'s SOAF [47-10] (hereinafter "Job Posting 3"), at 4.)

[3]    Thomas's Statement of Additional Facts asserts that Thomas received a one on KSA 4 and a zero on KSA 8 – "Ability to monitor mail processing operations . . . . " (Pl.'s SOAF ¶ 11.) This appears to be a mistake: The grading matrix for Job Posting 1 shows that Thomas received a one on KSA 8 and a zero on KSAs 4 and 7. (Job Posting 1 at 5.)

For KSA 7, Katina Powe found it suspicious that Thomas said he had "scheduled training for mail handlers and trained 14 mail handlers . . . to operate the fork[lift] and mule."[4]  (Job Posting 1 at 7; Powe Dep. at 54:23–55:7.)  Powe took this to mean that Thomas, himself, had trained 14 mail handlers, and she testified that "Supervisors do not train employees.  Trainers, qualified trainers, train employees on fork[lift]s and mules."  (Powe Dep. at 55:4–7.)  Only "craft" employees receive the training to train mail handlers.  (*Id.* at 56:15–22.)  Powe acknowledged that Thomas was a distribution clerk and flat sorting machine operator between 1994 to 2000, both of which appear to be "craft" positions.  (*Id.* at 57:6–58:16; Pl.'s SOAF ¶ 6; Def.'s Resp. to Pl.'s SOAF ¶ 14.)  Powe also testified, however, that Thomas "lacked the communication skills to conduct the on-the-job training [and] lacked the communication skills when issuing instructions."  (Powe Dep. at 73:3–9.)  Whether Thomas himself, or other craft employees were specifically tasked with training, Powe asserted that several of Thomas's subordinates were not provided proper training "[u]nder Thomas's direction."  (*Id.* at 54:12–19.)

St. John testified that he thinks the most important qualities for an MDO applicant are "communication" and "working as a team."  (St. John Dep., Ex. 3 to Def.'s 56.1 [34-3] (hereinafter "St. John Dep."), at 42:18–43:4; Def.'s 56.1 ¶ 5.)  He characterized the successful candidate, Binkley, as a person who has a "positive" attitude and is "a great communicator" who "people want to work for."  (St. John Dep. at 43:7–10.)  Powe provided similar testimony, adding that Binkley was "open to being mentored" and "to any kind of guidance."  (Powe Dep. at 112:3–20, 113:2–6.)  Thomas, by contrast, was "not very receptive of corrective criticism" and instead would "be more so in the defense" when receiving feedback.  (*Id.* at 112:16–20; 113:2–9.)  St. John also testified that "it's well known [that Thomas] is difficult to work with."  (St. John Dep. at 70:1–19.)

---

[4]  The record does not provide the definition of a "mule" other than to suggest that it is something employees drive around the sorting area.  (Thomas Dep. at 152:25–153:20.)  Perhaps Thomas was referring to something like the Kawasaki Mule, a golf-cart-type vehicle designed specifically for workplace jobs.  *Government Sales*, Kawasaki, https: /www.kawasaki. com/en-us/government-fleet/government-sales?cm_re=GLOBALNAV-_-GOVERNMENTFLEET-_-GOVERNMENTSALES (last visited Mar. 9, 2021).

According to St. John, Thomas is "very hardheaded. Very hard to convince to do something a way that he didn't want to do it."  (*Id.* at 67:14–18.)

Thomas disagrees with St. John's and Powe's assessment of Binkley's qualifications. Thomas himself supervised Binkley for almost 15 years (presumably while she was a clerk and he was a supervisor of attendance control and an SDO).  (Pl.'s Decl. ¶ 7; Pl.'s SOAF ¶ 6; Binkley Dep., Ex. 5 to Def.'s 56.1 [34-5] (hereinafter "Binkley Dep."), at 17:22–18:23.)  He felt she had a poor work ethic, often slept during her shifts, and, in his experience, "none of the employees liked her because she had a bad attitude and did not communicate well with her coworkers."  (Pl.'s Decl. ¶ 7.)  There is no evidence that Thomas disciplined Binkley for these failures, nor that the hiring committee was aware of them.  Thomas also stated that he knew of a couple of employees who had filed grievances against Binkley, but he could not recall who they were, and offered no evidence of their contents or the dates on which they were filed.  (*Id.*)  Again, there is no evidence that the hiring committee was aware of any such grievances.  The Level 20 MDO position that Binkley held when she applied for Job Posting 1 was one she had been awarded in 2015.  (Pl.'s SOAF ¶ 19.)  Thomas had applied for that position in 2015 as well and was not interviewed for it; he believes he was more qualified than Binkley for that 2015 MDO position and that her 2015 selection, too, was an instance of discrimination.  (*Id.* ¶ 20.)

According to Thomas, Binkley ultimately performed poorly in the 2017 MDO position that she was awarded.  He testified that, in January 2018, she yelled at him multiple times over the radio and in front of his employees.  (Thomas Dep. at 93:13–99:24.)  The first time, Binkley had found one of Thomas's employees in the cafeteria during a shift (*id.* at 93:13–24), and, the second time, Binkley accused Thomas of allowing employees from the previous shift to leave without securing their replacements.  (*Id.* at 95:9–98:10.)  Binkley admits she raised her voice but testified that she is a "feisty person" who tends to raise her voice in general.  (Binkley Dep. at 115:14–22.)  Thomas also testified that, on multiple dates around December 17, 2017, Binkley moved him between three or four operational units throughout the day instead of reassigning Black

supervisors who had not been moved at all. (Thomas Dep. at 102:6–104:18.) He also suspects Binkley deleted some of his work hours, though he provides no evidence to support this suspicion and never spoke to anyone in management about this perceived error. (Pl.'s SOAF ¶ 48; Def.'s 56.1 ¶ 36.) Sometime before March 2018, Binkley was removed from her MDO position and transferred to an SDO position at another office because she was under investigation for "put[ting] time in" for her son who was an employee at USPS. (Binkley Dep. at 118:4–119:15; Pl.'s SOAF ¶ 24.) Around August 2020, Binkley was terminated; the reason(s) for her termination do not appear in the record. (Pl.'s SOAF ¶ 24.)

**B.     Job Posting 2**

On June 21, 2017, Thomas applied for Job Posting 2: a Level 20 MDO position. (Pl.'s SOAF ¶ 28.) The KSA qualifications for this posting were identical to the KSAs for Posting 1, and Thomas submitted a similar application. (*Id.*) This time, the hiring committee gave Thomas a score of one on KSA 7 (on-the-job training) but he again received a zero on KSA 4 (oral communication skills). (Job Posting 2 at 4–5.) Thus, Thomas again failed to receive an interview. (Pl.'s SOAF ¶ 35.) When asked why Thomas's KSA scores differed this time around, St. John explained "It's a collective rating from the [hiring] committee," and noted that this hiring committee had included Binkley rather than Gilbert. (St. John Dep. at 57:1–21; Def.'s Resp. to Pl.'s SOAF ¶¶ 28–29.) Job Posting 2 was awarded to Kathryn Brown, a Black woman who, like Thomas, had previously served as an acting MDO. (Pl.'s SOAF ¶ 31; Brown Application, Ex. 5 to Pl.'s SOAF [47-5] (hereinafter "Brown Application"), at 2.) Brown's application did not specify when she had become an acting MDO but suggests she had served in the position in some capacity since at least 2013. (Brown Application at 2, Summary of Accomplishments #3.)

Job Posting 2 sought an individual who would serve on Carol Stream's third shift, referred to as "Tour 3." (Def.'s 56.1 ¶ 23.) Tour 3 is the busiest tour and the only one led by a pair of MDOs, rather than just one. (Dep. of Branch Manager Quintin Mayberry Dep., Ex. 2 to Def.'s 56.1 [34-2] (hereinafter "Mayberry Dep."), at 43:12–22, 62:12–21.) It is also the only shift that

includes a "cancellation unit," where employees cancel the stamps on mail before supplying it to automated machines.[5]  (Powe Dep. at 114:18–115:14.)  When asked to compare Thomas's qualifications for this Posting with those of Brown, Powe testified that Brown had "vast experience" with Tour 3 and its cancellation unit, whereas Thomas had "limited experience" with that operation.  (*Id.* at 114:10–17.)  Though he contends he could have learned the work easily, Thomas admitted he did not have "considerable experience" with the cancellation unit.  (Pl.'s SOAF ¶ 34.)  Powe noted that Brown, like Thomas, had received complaints about her communication style, but that rather than reacting defensively, Brown "was willing to listen" and "seek guidance if there was something [she] needed to correct."  (Powe Dep. at 116:7–16.)  St. John praised Brown's management style, testifying that "[Brown] is like a bulldog.  She is a very good MDO . . . When you tell her to do something, she will find a way to get it done."  (St. John Dep. at 68:1–8.)  In St. John's view, she is not "hardheaded," but is "very strong" and "will bulldoze you if you let her, but she gets the job done."  (*Id.* at 68:17–22.)  Thomas, in St. John's view, could function as an MDO "for two days, for a week, maybe," but not for much more time than that due to his "lack of communication skills."  (*Id.* at 69:1–13; Pl.'s Resp. to Def.'s 56.1 [46] ¶ 7.)

Thomas served as Binkley's backup MDO between 2015 and 2017.  (Def.'s 56.1 ¶ 8; Pl.'s Decl. ¶ 4.)  Binkley testified that, during that time, multiple employees complained to Binkley about Thomas, including one female employee who came to Binkley in tears because of the way Thomas had spoken to her.  (Binkley Dep. at 120:12–23, 121:17–122:1.)  Thomas was required to participate in mediation with another female employee (*id.* at 121:21–122:1), and two separate female employees filed Equal Employment Opportunity complaints against Thomas while he served as acting MDO.  (*Id.* at 120:12–23, 123:24–124:7.)  Thomas does not deny the existence

---

[5]     Mayberry testified that the cancellation operation's function is "dealing with mail going through the cancellation units that puts the date on letters."  (Mayberry Dep. at 68:7–14.)  It is not clear to the court if this description conflicts with, or supplements, Powe's description. Regardless, both witnesses testified that only a limited subset of Carol Stream employees are familiar with the cancellation unit.  (Powe Dep. at 114:18–115:6; Mayberry Dep. at 68:7–14.)

of the two EEO complaints but suggested that the female employees had filed them because he had not allowed them to do as they pleased while they were on his shift. (Pl.'s Decl. ¶ 6.)

In September 2017, Thomas was transferred to Tour 3 after Plant Manager Mike Kotula told Binkley to remove Thomas from his position as Tour 1's backup MDO. (*Id.* ¶ 4; Binkley Dep. at 125:14–20.) Thomas asserts that he was removed "so that a black SDO, Rhonda McGinnis . . . could be trained." (Pl.'s Decl. ¶ 4.) Thomas points to no evidence supporting this statement or suggesting it was based on Thomas's personal knowledge. To the contrary, Thomas testified that he did not even know who had made the decision to move him, and when he asked Binkley why he was being moved, she replied "I don't know . . . The upper managers have made the decision." (Thomas Dep. at 70:8–19.) Nor has Thomas identified any evidence that his removal was motivated by animus. Two and a half months after his move to Tour 3, Thomas returned to Tour 1 but was not restored as backup MDO. (Pl.'s Decl. ¶ 4.) Thomas testified that he asked Binkley to allow him to serve as her backup MDO, but Binkley had already offered the position to Glenda Bruce and did not want to rescind that offer. (Thomas Dep. at 70:13–19.)

## C. Job Posting 3

Finally, in December 2017, Thomas applied for Job Posting 3, another Level 20 MDO position for Tour 3. (Pl.'s SOAF ¶ 36.) The recipient of this position would serve alongside Brown as co-MDO. (Def.'s 56.1 ¶ 27.) This time, Thomas was interviewed for the position. (*Id.* ¶¶ 28– 29.) Unlike Job Postings 1 and 2, Job Posting 3 was overseen by a new selecting official, Quintin Mayberry. (*Id.* ¶ 27.) Mayberry instructed the hiring committee to interview any candidate who had served as an acting MDO because he felt he "owe[d] them an interview." (Mayberry Dep. at 41:3–20, 44:13–20.)

Thomas interviewed on January 12, 2018. (Job Posting 3 at 4–5; USPS EEO Final Agency Decision, Ex. A to Compl. [1-1] (hereinafter "Agency Decision"), at 15.) At the end of February 2018, he learned he had not been selected for the promotion. (Agency Decision at 15.) Instead, Mayberry—with input from the committee members—selected Annie Plane ("Plane").

(Mayberry Dep. at 46:5–8, 55:20–23.)  Plane is a Black woman who, according to St. John, "is a good fit with [co-MDO] Kathryn Brown" since Brown has "such a strong personality," while Plane is "soft spoken" and "gets along well with other fellow MDOs."[6]  (St. John Dep. 73:3–13.)  Powe agreed that Plane has a "good rapport and relationship" with the employees and managers.  (Powe Dep. at 117:8–15.)  Mayberry, who sat in on both Thomas's and Plane's interviews, wrote "Overall, not bad," in his notes for both applicants.  (Mayberry Dep. at 38:24–39:10.)  For Thomas, however, Mayberry followed that with "Could have given better elaborations."  (*Id.*)  For Plane, on the other hand, Mayberry noted "Knew what to do.  Understand [*sic*] mail process and knew key indicators."  (*Id.*)  Mayberry testified that Thomas "answered the questions, but he didn't go into detail [and] depth like Ms. Plane did."  (*Id.* at 40:8–13.)  Plane "went into detail and depth about each question . . . ."  (*Id.*)  Thomas felt confident about his performance at the interview and recalls that Plane told him, a few days after her interview, that she did not think it had gone well.  (Pl.'s Decl. ¶ 13.)

**D.  Thomas's Applications**

Thomas's written application (eight pages long) was longer than Binkley's (three pages), Brown's (four pages), and Plane's (three pages).  (Pl.'s SOAF ¶¶ 5, 17, 31, 37.)  Moreover, Thomas contends that the successful candidates' applications were inaccurate or incomplete: Binkley's application for Job Posting 1 failed to include a summary of accomplishments for each KSA, misstated her current title, and included text from an application she had prepared two years earlier.  (*Id.* ¶¶ 17–19.)  It also listed no references.  (*Id.* ¶ 21.)  Brown's application for Job Posting 2 listed SDO as her only work experience and misstated the amount of time she spent in that position.  (*Id.* ¶ 31.)  And Plane's application did not list any references or special skills.  (*Id.* ¶ 37).  Thomas's application provided ten references and listed completed job training in 22

---

[6]    Mayberry selected Stephanie Baker as his first choice, but Baker declined in favor of another position elsewhere.  (Def.'s 56.1 ¶ 30 (citing Mayberry Dep. at 33:17–34:10).)  Mayberry then offered the job to Plane as his second choice, while Thomas would have been his third choice.  (*Id.* (citing Mayberry Dep. at 40:21–41:2).)

courses.  (*Id.* ¶ 7.)  It also provided a detailed summary of his accomplishments relating to each of the eight KSAs.  (*Id.* ¶ 5.)  Binkley's and Plane's applications listed no education beyond high school (*id.* ¶¶ 21, 37), and Brown's application stated that she had started, but not completed, an undergraduate degree.  (Brown Application at 2.)  Thomas's application, on the other hand, boasted a bachelor's degree in physics, three certifications in computer and information science, and professional and associate's degrees in accounting.  (Pl.'s SOAF ¶ 7.)

Thomas had significantly greater educational achievements than any of the successful applicants, but none of the three job postings noted a preference for higher education.  (Job Posting 1 at 2–3; Job Posting 2 at 2–3; Job Posting 3 at 2–3.)  Powe testified that the Level 22 MDO position did not require any education beyond high school, and that she personally would not have given any preference to a candidate with a bachelor's degree or other higher education. (Powe Dep. at 113:13–23.)  USPS's hiring procedures also do not require the hiring committee to limit their review to the contents of the written applications.  (*See generally* EAP Handbook.)  St. John admitted that Thomas's application was "well-written" (Def.'s Resp. to Pl.'s SOAF ¶ 11 (citing St. John Dep. at 30:1–5)), but testified that, especially for a Level 20 or 22 position, "it would be shortsighted to rely only on what's on the page in an application." (St. John Dep. at 31:22–32:6.) Indeed, one of the benefits of promoting candidates from the workforce is "you know their history. You know their work history.  You know their work methods."  (*Id.* at 23:12–15.)  Even if an application is well-written and the applicant is well-qualified, "if they can't work with people or they have difficulty communicating, then that's a no."  (*Id.* at 32:2–6.)  St. John testified that "[F]rom working with [Thomas] for many years, [St. John believed that Thomas] has difficulty with communicating and working with people."  (*Id.* at 33:9–13.)

Powe similarly testified that the members of the review committee "take our knowledge of . . . the applicants into consideration when . . . ranking them or . . . evaluating them.  We take our firsthand knowledge of them into consideration."  (Powe Dep. at 72:2–6.)  Powe testified that the committee, indeed, considered their own experiences when deciding to give Thomas a score

of zero on KSA 7 for Job Posting 1. (*Id.* at 53:16–54:6.) As mentioned above, Powe relied on information from Thomas's employees who felt they had not received proper training while he was their supervisor. (*Id.* at 54:7–19.) She also testified that, for Job Posting 1, she felt Binkley's "work experience and work knowledge had already been established, and . . . if I am aware of your qualifications, your work experience, if you have demonstrated to me all the requirements of the job, I can use my knowledge" when considering your application. (*Id.* at 63:2–10.)

While St. John and Powe suggested their decisions were based on Thomas's work experience, Thomas asserted that he had never worked directly for or with Gilbert, Powe, or St. John. (Pl.'s Resp. to Def.'s 56.1 ¶ 11 (citing Pl.'s Decl. ¶ 2).) The record shows that St. John, Powe, and Binkley all did have significant contacts with him, however. St. John testified that he had worked with Thomas for over ten years, ever since Thomas started working at the Carol Stream facilities. (St. John Dep. at 8:10–15.) Powe had known Thomas for 15 years, had served as the titled MDO on the tour immediately following Thomas's, and had previously managed Thomas as the acting MDO on his shift. (Powe Dep. at 15:13–22, 19:6–20:11.) Binkley had worked with Thomas for over 20 years. (Binkley Dep. at 30:12–31:3.) Thomas had supervised Binkley from around 2000 to around 2003 (Pl.'s Decl. ¶ 7; Pl.'s SOAF ¶ 6; Binkley Dep. at 17:22–18:23), and Binkley had been Thomas's supervisor from 2015 to 2017. (Thomas Dep. at 17:23–18:13; Pl.'s Decl. ¶ 4.) Thomas acknowledged that "almost all of the employees at Carol Stream have been managed by him at one point or another (either as their supervisor or as the acting MDO)." (Pl.'s Resp. to Def.'s 56.1 ¶ 10.)

On December 21, 2017, Thomas filed an EEO claim with the USPS, alleging retaliation and discrimination on a number of bases, including race and national origin. (Agency Decision at 1–2.) Thomas testified that, after filing this claim, he received an offer to serve as a temporary MDO at the Chicago International Service Center ("CISC"), contingent on Carol Stream management's releasing him to work the position. (Thomas Dep. at 110:4–112:16.) Mayberry agreed to release Thomas on the condition that Thomas withdraw his EEO claims. (*Id.* at 113:5–

11

19.)  Thomas declined.  (*Id.* at 114:15–115:6.)  On August 27, 2018, the USPS issued an agency ruling, finding that "the evidence does not support a finding that [Thomas] was subjected to discrimination as alleged."  (Agency Decision at 42–43.)  On November 28, 2018, Thomas filed this case in federal court, alleging unlawful retaliation and discrimination on the bases of race, sex, and national origin.  (Compl. ¶¶ 9–34.)  Defendant has moved for summary judgment [32], asserting that no reasonable jury could find for Thomas on his retaliation or discrimination claims. In his response, Thomas withdrew all claims other than his claims for failure to promote based on race and national origin.  (Pl.'s Opp'n [45] at 1 n.1.)

## DISCUSSION

To survive a motion for summary judgment, the non-moving party must "identify[ ] specific, admissible evidence showing that there is a genuine dispute of material fact for trial."  *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017)).  A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  While "the burden on the non-movant is not onerous," the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact."  *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotations omitted).  Nor can the non-moving party rely on "[i]nferences supported only by speculation or conjecture."  *Johnson*, 892 F.3d at 894.  A district court must "examine the record in the light most favorable to the non-movant, granting [that party] the benefit of all reasonable inferences that may be drawn from the evidence . . . . "  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (internal quotations omitted).

As the Seventh Circuit has repeatedly explained, "the singular question that matters in a discrimination case" is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or national origin] . . . caused the . . . adverse employment action."  *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019) (internal quotations

omitted).  Courts may continue to address the well-known *McDonnell Douglas* test as a way of "culling the relevant evidence needed" to answer this question.  *Tyburski v. City of Chicago*, 964 F.3d 590, 598–99 (7th Cir. 2020).  The court must, however, consider the evidence "as a whole" rather than treating so-called "direct" evidence differently from so-called "indirect" evidence.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Under the *McDonnell Douglas* paradigm, a plaintiff must "first produce evidence of a *prima facie* case for failure to promote."  *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 891 (7th Cir. 2016). To do so, a plaintiff needs evidence that "(1) he is a member of a protected class, (2) he was qualified for the position sought, (3) he was rejected for the position, and (4) someone outside the protected class who was 'not better qualified' was hired instead."  *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020).  Once a plaintiff provides enough evidence to establish a *prima facie* case of discrimination, the defendant may offer "evidence of a legitimate nondiscriminatory reason" for its decision.  *Id.*  To defeat summary judgment in this context, the plaintiff bears the burden of producing "evidence that the defendant's proffered reason was pretextual."  *Id.*  "Because the prima facie and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for its actions, we can proceed directly to the pretext inquiry."  *Id.* (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009)).

## A.    Legitimate, nondiscriminatory reasons

Defendant here has offered several non-discriminatory reasons for its selection of Binkley, Brown, and Plane over Thomas.  For Job Posting 1, scores of zero on KSA 7 (ability to lead on-the-job training) and KSA 4 (oral communication skills) prevented Thomas from progressing to the interview stage.  (Job Posting 1 at 5.)  For Job Posting 2, a score of zero on KSA 4 did the same.  (Job Posting 2 at 4–5.)  Regarding KSA 7, St. John felt Thomas's lack of communication skills undermined his ability to train effectively.  (St. John Dep. at 67:14–24.)  Powe also testified that Thomas "lacked the communication skills to conduct on-the-job training" (Powe Dep. at 73:6–7), and that several of Thomas's subordinates from his time as an SDO told her that they had not

13

been properly trained while under his supervision. (*Id.* at 54:12–19.) Though she believed Thomas was responsible for proper training, Powe found it suspicious that Thomas claimed that, as an SDO, he had personally performed the training that ordinarily would have been provided by craft employees rather than supervisors. (*Id.* at 54:23–56:22.)

Regarding KSA 4, St. John testified that he felt "communication" and "working as a team" were the most important characteristics for a prospective MDO. (St. John Dep. at 42:18–43:4.) He testified that Thomas is "hardheaded," difficult to convince to do things in any particular way, and known to be difficult to work with. (*Id.* at 67:14–18, 70:2–19.) St. John believed that Thomas's communication problems prevented him from effectively running the floor for more than a week or so at a time. (*Id.* at 69:1–13.) Powe confirmed that Thomas did not communicate well with either employees or managers. (Powe Dep. at 73:3–9, 117:13–21.) Binkley, who joined the hiring committee for Job Posting 2, testified similarly: she recalled that when Thomas served as her backup MDO between 2015 and 2017, several employees had complained about him, one was reduced to tears by Thomas, and another had a conflict with Thomas serious enough to require the involvement of a mediator. (Binkley Dep. at 121:17–122:1.) Finally, Powe testified that, when told of his shortcomings, Thomas was "not very receptive of corrective criticism." (Powe Dep. at 112:16–20.)

Mayberry testified that Thomas did not receive Job Posting 3 because "[h]e wasn't the best qualified." (Mayberry Dep. at 26:8–12.) With recommendations from the hiring committee, Mayberry selected a candidate based on "who did the best during the interviews." (*Id.* at 17:7–18:11.) Mayberry testified that Plane performed better than Thomas in the interviews by providing more detailed, in-depth answers than Thomas. (*Id.* at 40:8–20.) Mayberry's contemporaneous notes of the interviews confirm that assessment; he wrote of Plane that she "Knew what to do. Understand [*sic*] mail process and knew key indicators," but that Thomas "[c]ould have gave [*sic*] better elaborations." (*Id.* at 38:24–39:10.)

Beyond the KSA scores and interview responses, the members of the hiring committee outlined a number of other reasons for preferring Binkley, Brown, and Plane over Thomas. Job Posting 1 was a Level 22 MDO position for which Binkley, already at Level 20 MDO when she applied, had greater experience than Thomas, who was at the time a Level 17 SDO who had served only as a backup MDO. (St. John Dep. at 39:6–11; Powe Dep. at 63:2–10.) Additionally, committee members testified that, unlike Thomas, Binkley was a great communicator who inspired people to do well for her, took a hands-on approach to her subordinates, was receptive to criticism, and wanted to improve. (St. John Dep. at 43:7–20; Powe Dep. at 112:15–20.) For Job Postings 2 and 3, the successful candidates would serve as co-MDOs on Tour 3. Powe testified that Brown—the successful applicant for Job Posting 2—had "vast experience" with Tour 3's complexities and its cancellation unit while Thomas did not. (Powe Dep. at 114:10–17.) St. John also noted that Brown was open to feedback, had performed well in her previous role as an acting MDO, proved she could "move mail," and "[w]hen you tell her to do something, she will find a way to get it done." (St. John Dep. at 68:1–69:13.) As for Plane—the successful applicant for Job Posting 3—Powe testified that, unlike Thomas, Plane is "quite knowledgeable" of Tour 3's operations and has a good relationship with the craft employees and managers. (Powe Dep. at 117:8–15.) St. John testified that Plane was also a good fit for co-MDO Brown because Plane was "soft-spoken" while Brown had "a strong personality." (St. John Dep. at 73:3–13.)

In short, the committee members and Mayberry believed that Binkley, Brown, and Plane were more qualified than Thomas for their respective jobs. The Seventh Circuit has repeatedly held such a good-faith belief is a legitimate, nondiscriminatory reason for a challenged employment action. *See, e.g.*, *Riley*, 829 F.3d at 893 (citing *Scruggs*, 587 F.3d at 838) (holding that hiring someone because the employer believes them to be more qualified than plaintiff for the position is a legitimate, nondiscriminatory reason). Accordingly, the court will jump to the question of whether these proffered reasons are pretextual.

15

**B.    Pretext inquiry**

Even a purportedly legitimate reason for an employment decision may be not be the real reason, and Thomas could defeat summary judgment by presenting evidence from which a jury could find that the proffered reasons are pretextual.  "Simply put, pretext is a lie—a phony reason for some action."  *Riley*, 829 F.3d at 894 (internal quotations omitted).  The evidentiary bar for demonstrating pretext, however, is a high one.  *Id.*  The court does not "reexamine business decisions as a super-personnel department."  *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (internal quotations omitted).  "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge."  *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (internal quotations omitted).  Thus, a plaintiff must show that either "(1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible."  *Mullin*, 732 F.3d at 778 (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)).  A plaintiff can do so by "identify[ing] weaknesses, implausibilities, inconsistencies, or contradictions . . . [such] that a reasonable person could find [the proffered reasons] unworthy of credence."  *Harper*, 687 F.3d at 311 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).  "Where an employer proffers more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons."  *Mullin*, 732 F.3d at 778 (internal quotations omitted).

**1.    Thomas's education and written application do not indicate pretext**

Thomas repeatedly emphasizes his superior formal education and more complete written applications than those of the other candidates.  But it is clear that the hiring committee viewed such achievements as largely irrelevant to the job at hand.  Powe testified that Job Posting 1 did not require any education beyond a high school diploma and that she would not have given any preferential treatment to an applicant with higher education.  (Powe Dep. at 113:13–23.)  Mayberry, who made the final decision concerning Job Posting 3, testified that he himself has no

more than a high school education and that his promotion through the ranks to the position of plant manager, over some 1600 employees, "doesn't have anything to do" with his education but was instead a product of "my work ethic, my dedication and people skills." (Mayberry Dep. at 82:10–12, 85:5–19.) And none of the three postings listed a preference for higher education of any kind. (Job Posting 1 at 2–3; Job Posting 2 at 2–3; Job Posting 3 at 2–3.) This lies in contrast to other positions at USPS where higher education sometimes does warrant preferential treatment. (*See* EAP Handbook at 5.) It is likewise undeniable that Thomas's written application was more complete than Binkley's, Brown's, or Plane's. As noted, Thomas's application was far longer than the other applicants'; in addition, his application listed more references, included a more complete job history, and did not include mistakes made by other applicants. (Pl.'s SOAF ¶¶ 5–7, 17–19, 21, 31, 37.)

Still, these differences are not dispositive. The hiring committee openly based their hiring decisions on their experiences with and work history of the applicants. St. John noted this as a benefit of hiring from within for higher-level positions: "[Y]ou know their history. You know their work history. You know their work methods." (St. John Dep. at 23:12–15.) For similar reasons, St. John testified that, especially for a Level 20 or 22 position, "it would be shortsighted to rely only on what's on the page in an application." (*Id.* at 31:22–32:6.) And despite Thomas's assertions to the contrary, the EAP Handbook contains no policy requiring the committee to make decisions based solely on the written application. (*See generally* EAP Handbook.) In fact, where the guidelines mention written materials, they indicate a distaste for overemphasizing their value, and specifically prohibit a hiring committee from requiring applicants to do things like "take a written test," "analyze and solve in writing a prescribed problem," or "undergo[ ] any other written examination." (*Id.* at 7.) The evidence does not suggest that the committee was acting inconsistently with Handbook policy in looking beyond the four corners of Thomas's, Binkley's, Brown's, and Plane's written applications in choosing candidates for interview.

17

Next, Thomas argues that, beyond his written application, the committee members—Gilbert, Powe, and St. John in particular—"did not have the opportunity to assess [his] performance as an SDO or acting MDO" because Thomas had "never worked directly for or with" any of them.[7]  (Pl.'s Decl. ¶ 2.)  Even assuming this is true, Thomas presents no authority for the notion that the hiring committee could only consider Thomas's past performance if they, themselves, had personally observed it.  The members of the committee could well have based their hiring decisions on what they had heard from others about Thomas's past performance and general reputation.  There would be no shortage of information about Thomas's supervisory style from his time at the Carol Stream office: Thomas himself acknowledged that "almost all of the employees at Carol Stream have been managed by him at one point or another (either as their supervisor or as the acting MDO)."  (Pl.'s Resp. to Def.'s 56.1 ¶ 10.)  And even if the court accepts that Powe and St. John had never directly supervised or worked with Thomas, the record makes clear that both had known him for some time.  St. John testified that he and Thomas had been working together at the Carol Stream facilities for more than ten years.  (St. John Dep. at 8:8–15.)  Powe testified that she had known Thomas 15 years and has worked as the MDO for the shift immediately following Thomas's for the past five years.[8]  (Powe Dep. at 15:13–22, 19:6–20:2.)  In that time, whether they had worked directly with him or not, St. John and Powe could have learned of Thomas's reputation for being difficult to work with, his troubles with female employees, and his inability to successfully run the floor long-term.

### 2.    Thomas was not "clearly more qualified" than Brown or Plane

---

[7]    This argument applies most directly to Job Posting 1 because Binkley was on the committee for Job Postings 2 and 3, and Thomas does not challenge Binkley's experience working with and supervising him.  (Pl.'s Resp. to Def.'s 56.1 ¶ 11.)

[8]    Powe also testified that she had managed Thomas directly when she had filled in as an acting Tour 1 MDO from time to time (Powe Dep. at 20:3–22), but this is disputed.  Thomas stated in his declaration that Powe had never directly supervised him.  (Pl.'s Decl. ¶ 2.)

Thomas believes he was more qualified for each job posting than the three individuals that Defendant promoted in his stead. A plaintiff, however, must clear an especially "high hurdle" to "establish pretext through [his] own superior qualifications for the position." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 404 (7th Cir. 2008). A plaintiff challenging a failure to promote can defeat summary judgment only if the evidence shows that the differences between plaintiff and the chosen candidate were "so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was *clearly better qualified* for the position at issue." *Riley*, 829 F.3d at 894 (emphasis in original) (quoting *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009)). Further, "[a]n employee's own opinions about [his] . . . qualifications [do not] give rise to a material factual dispute." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (internal quotations omitted); *accord. Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007) ("We have repeatedly stated, however, that plaintiffs must offer more than mere self-serving appraisals.").

Thomas fails to meet this standard with respect to either Brown or Plane. Both Brown and Plane had experience with Tour 3 and its cancellation unit, experience Thomas admittedly lacked. (Pl.'s SOAF ¶ 34.) Thomas noted that of the 12 operational units involved in Tour 3, he knew all of them except the "cancellation" unit and believed he could likely learn the cancellation unit quickly. (Pl.'s Decl. ¶ 13.) Even assuming this is true, it does not suggest that Defendant's reliance on the successful candidates' experience was a pretext; a reasonable person could believe that an individual with Tour 3 cancellation experience is as qualified or more qualified for a Tour 3 MDO position than an individual without such experience. Further, for Job Posting 3, Thomas provided no evidence to counter St. John's testimony that Plane, a soft-spoken individual who is easy to get along with, would be a good fit for co-MDO Brown's strong personality, and that Thomas himself was "difficult to work with." (St. John Dep. at 70:1–19, 73:3–13; Def.'s 56.1 ¶ 31.)

Thomas contends that St. John's emphasis on communication skills should have resulted in Brown's being disqualified. Thomas notes St. John's use of the words "bulldoze," "bulldog," and "hardheaded" to describe Brown. As the court reads the record, however, St. John did not view those adjectives as pejorative. St. John testified:

> [Brown] is a very strong-willed person. She is like a bulldog. She is a very good MDO . . . She is not so hardheaded. She is just very strong. She will bulldoze you if you let her, but she gets the job done. When you tell her to do something, she will find a way to get it done and not complain.

(St. John Dep. at 68:5–22.) True, Brown had received complaints in the past, but Powe emphasized that, unlike Thomas, Brown "was willing to listen" to such feedback and to "seek guidance if there was something [she] needed to correct." (Powe Dep. at 116:7–16.) Ultimately, the selection committee gave Brown a two out of two for the KSA related to communication. (Pl.'s SOAF ¶ 32.)

Thomas's challenge to Plane's selection is no more persuasive. He suggests that Mayberry's statement that Plane had outperformed him in her interview must be pretextual. Thomas points out that Plane had shared with him her concern that she had not interviewed well, while Thomas himself felt confident about his interview performance. (*Id.* ¶ 39.) But the candidates' comparative self-confidence says little about their actual interview performance or their qualifications for the job. Thomas has failed to demonstrate that he was clearly more qualified than Brown or Plane for Job Postings 2 and 3, respectively.

### 3.  Thomas was not clearly more qualified than Binkley

That leaves Thomas's claim that he was more qualified than Binkley. He asserts, first, that Binkley did not have more supervisory experience than he, because he had been an acting MDO for as long as or longer than Binkley had been a titled MDO. (Pl.'s Opp'n at 12.) This argument has little traction: Thomas had filled in as acting MDO when necessary between 2015 to 2017, but Binkley had served as a titled MDO while Thomas had only served as a backup when the titled MDO was not available. And although Thomas had spent more time at the lower-rank

of SDO than Binkley, his belief in the value of this experience is not enough to establish that "no reasonable person" could have chosen Binkley over Thomas. *Fischer*, 519 F.3d at 404. Similarly, in *Riley*, the Seventh Circuit held that plaintiff had failed to show she was "clearly better qualified" despite evidence that she had more teaching experience and more seniority than the applicants whom the defendant hired. *Riley*, 829 F.3d at 894–95.

Second, Thomas points to a number of Binkley's behaviors as evidence that she was not qualified for the Level 22 MDO position offered in Job Posting 1. The court notes that much of this evidence relates to events that occurred *after* the hiring committee and selecting official decided to promote Binkley. In October 2017, another Asian-Indian employee identified Binkley in an EEO complaint of race and national origin discrimination against the Postal Service. (*Saggu v. Brennan*, No. 19-cv-2303, Dkt. 1-1 at 2–3.) Binkley was removed from her MDO position in March 2018 after accusations that she had assigned extra work hours to her son. (Pl.'s SOAF ¶ 24.) In August 2020, Binkley was terminated; whether that termination was connected to either of the other events is not clear from the record. (*Id.*) What is clear is that the incident involving Binkley's son and the EEO charge occurred only *after* the June 2017 promotion decision, and there is no basis for a finding that the decision-makers were aware of Binkley's alleged misconduct at the time they made that decision. Subsequent events may suggest that the promotion decision was a mistake; they do not throw shade on the committee's stated belief that Binkley was the best choice for the Level 22 MDO position in June 2017. *See Mullin*, 732 F.3d at 778 ("A mere mistake by an employer does not constitute pretext . . . . "); *see also Harper*, 687 F.3d at 311 ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." (internal quotations omitted)).

Thomas also identified a number of personal experiences he had with Binkley before she applied for Job Posting 1. For example, he stated that, in the 15 years he had supervised Binkley, he sometimes found her sleeping or in the breakroom during her shift, that he believed she

exhibits a poor work ethic and a bad attitude, and that she was disliked by other employees due to her attitude and poor communication skills. (Pl.'s Decl. ¶ 7.) There is no evidence, however, that anyone on the hiring committee shared Thomas's negative view of Binkley's qualifications, or even that Thomas reported Binkley's alleged performance shortcomings to management at any time. Thomas also stated in his declaration that he "know[s] of a couple employees who have filed grievances/complaints against [Binkley], although I cannot recall who they were." (*Id.*) His declaration offers no details; he does not say when the grievances were filed, or by whom, and says nothing about how, if at all, the grievances were resolved. A hearsay report of two grievances filed at some unstated time does not defeat the showing that Binkley's record supported promotion in June 2017. *Johnson*, 892 F.3d at 894 ("Inferences supported only by speculation or conjecture will not suffice.")

Even if the committee was aware of Binkley's alleged performance deficiencies, Thomas can prevail at the summary judgment stage only if he can show that he was "clearly better qualified" than Binkley for the position he sought. *Fischer*, 519 F.3d at 404. Thomas cannot meet that burden in this case because it appears his own record shows similar deficiencies. Thomas himself acknowledged that two female employees had filed EEO complaints against him while he was acting MDO. (Pl.'s Decl. ¶ 6.) As addressed above, the members of the committee saw Thomas as having issues with attitude, communication skills, and ability to work with others.[9] At worst, then, Binkley's application suffered from some of the same weaknesses as Thomas's. Given that Binkley had two years' experience as a titled MDO before applying for Job Posting 1, and received scores of two across the board on KSAs, Thomas has still failed to show that he was "clearly more qualified" than Binkley for Job Posting 1.[10]

---

[9]    Powe also testified (without offering any specifics) that she had found Thomas sleeping on the job; Thomas denies this, however, and the court construes the facts in his favor at this stage. (Powe Dep. at 111:17–23; Pl.'s Decl. ¶ 7.)

[10]    For Job Posting 1, Powe testified that it would not have been typical to promote Thomas directly from his Level 17 position to a Level 22 position. (Powe Dep. at 111:2–11.)

Finally, Thomas argues that Defendant discriminated against him in 2015—two years before he applied for Job Posting 1—when they chose to hire Binkley, instead of Thomas, for a Level 20 MDO position. Any claim arising out of the 2015 events would be time-barred, but Thomas believes the 2015 episode is further evidence that he was a victim of discrimination in 2017. (Pl.'s Opp'n at 9.) In support, he cites *Fischer*, where the plaintiff challenged his employer's decision to promote another employee to a permanent director role just five months after choosing that other employee for the acting director position. 519 F.3d at 398–401. Reversing a grant of summary judgment to the defendant, the Seventh Circuit concluded there were genuine disputes of material fact as to (a) whether the first promotion was itself pretextual and (b) whether that first promotion was part of an elaborate scheme to fast-track the other employee, through the second promotion, to a permanent director position. The court thus found the second promotion was "sufficiently intertwined" with the first promotion so that "the evidence of pretext from [plaintiff's] time-barred claims would similarly support a finding that the reason offered for [the] promotion to the permanent post was also pretextual." *Id.* at 407–08.

This case differs. There is no basis in this record for a finding that Binkley's promotion to Level 20 MDO in 2015 and her promotion to Level 22 MDO in 2017 were "sufficiently intertwined" such that the 2015 episode is relevant to the 2017 promotion. Nor is there evidence that Defendant's reasons for promoting Binkley over Thomas in 2015 are suspect. Thomas asserts that he had far more experience as an SDO than Binkley when both applied for the 2015 position.[11] (Pl.'s Decl. ¶ 9; Pl.'s Opp'n at 8–9.) That evidence might support a challenge to the 2015 decision, had Thomas challenged it, but it does not alter the court's conclusion that Thomas

---

Thomas, however, stated that he was aware of "numerous employees" who had made similar jumps, including two non-Asian, non-Indian individuals: Ruben Garcia, promoted from Level 17 to 21 and Daniel Cobbins, from Level 17 to 23. (Pl. Decl. ¶ 8.)

[11]     Thomas also asserts in his opposition brief that, in 2015, Binkley "apparently submitted a similarly bare-bones application," but fails to support this statement with anything from the record. (Pl.'s Opp'n at 9 (citing Pl.'s SOAF ¶ 20).) Paragraph 20 of Plaintiff's Statement of Additional Facts does not support this assertion, nor does the underlying citation, paragraph 9 of Thomas's declaration. (Pl.'s SOAF ¶ 20 (citing Pl.'s Decl. ¶ 9).)

has failed to demonstrate that he was "clearly more qualified" than Binkley for the 2017 Level 22 MDO position.

### 4. Other circumstances

Other circumstances that trouble Thomas do not satisfy the court that his race or national origin were reasons he was not promoted. First, Thomas suggests it is suspicious that, despite submitting nearly identical applications for Job Postings 1 and 2, he received different KSA scores for each job. (Pl.'s Opp'n at 15–16.) For Job Posting 1, Thomas received a score of zero for KSA 7, but for Job Posting 2, Thomas received a score of one for KSA 7. (Job Posting 1 at 5; Job Posting 2 at 5.) In the court's view, identical scores on the two applications might have been equally suspicious. The hiring committees for the two postings were composed of different individuals: Powe, St. John, and Gilbert for Posting 1 and Powe, St. John, and Binkley for Posting 2. (Pl.'s SOAF ¶¶ 8–9, 28.) Given that the final KSAs represent a collective rating from the committee, switching out just one member of the committee could easily change an applicant's rating on a single KSA from zero to one. (Def.'s Resp. to Pl.'s SOAF ¶ 29 (citing St. John Dep. at 57:1–21).)

Second, Thomas stated that he "did not receive proper training like other non-Asian, Indian acting MDOs, despite many requests [he] made for training." (Pl.'s Decl. ¶ 4.) Apart from this statement in his declaration, the only evidence on this matter comes from Thomas's testimony that (1) MDOs ordinarily train SDOs by "hav[ing] them on the floor [and] show[ing] them what they need to do . . . while they are acting MDO" (Thomas Dep. at 76:6–18, 76:25–77:3.), and (2) in 2011, despite Thomas's request for training, then-MDO Jeff Wisner instead trained David Dittman, a man of Wisner's own ethnic background. (*Id.* at 75:18–76:18.) The court is left uncertain whether Thomas means that all acting MDOs were ordinarily entitled to training, what the training should have involved, or whether any other MDOs within or outside the protected class were also denied training. Nor has he offered evidence that a lack of training had anything to do with the promotion decisions challenged in this lawsuit.

Third, Thomas testified that, after he filed his EEO complaint, he received a job offer as a temporary MDO at the Chicago International Service Center ("CISC") subject to approval from management at Carol Stream. (Thomas Dep. at 110:4–112:12.) Mayberry offered the approval on the condition that Thomas drop his EEO claims, but Thomas refused. (*Id.* at 113:5–19; 114:15–115:6.) This episode is a troubling one; it suggests that the Postal Service retaliated against Thomas for having filed his charges. *See Peterson v. Mabus*, 112 F. Supp. 3d 733, 747 (N.D. Ill. 2015) ("Although a settlement offer normally cannot be considered retaliatory, the withholding of a benefit to which an employee would otherwise be entitled may amount to an adverse action."); *see also Jones v. Ryder Servs. Corp.*, No. 95 C 4763, 1997 WL 158329, at *5 (N.D. Ill. Mar. 31, 1997) (holding that withdrawing a workers' compensation settlement offer constituted actionable retaliation) (cited in *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 642 (7th Cir. 2004)). As explained earlier, however, Thomas waived his retaliation claims. (Pl.'s Opp'n at 1 n.1.) And any retaliatory motivation that post-dated the decisions not to select him for Job Posting 1, 2, or 3 does not establish that those decisions were the product of discriminatory animus.

Fourth, Thomas contends that Binkley exhibited animus in December 2017 and January 2018 by yelling at him in the presence of fellow employees and requiring him to move from one unit to another throughout the day, while she allowed Black SDOs to remain in one unit for their entire shift. (Thomas Dep. at 93:13–106:12.) Thomas testified that Binkley yelled at Saggu (another Asian-Indian SDO) as well, and identified three Black SDOs (Glenda Bruce, Steve Saflarski, and Nadia Seanior) who he claimed were not subject to this treatment; he could "[n]ot really" identify anyone other than that. (*Id.* at 101:24–102:5, 105:7–19.) But he also disclosed the reasons for Binkley's having yelled at him: on one occasion, Binkley found one of Thomas's employees in the cafeteria during a shift (*id.* at 93:13–24), and on another, Thomas had allowed employees from the previous shift to leave without securing their replacements. (*Id.* at 95:9–98:10.) Binkley acknowledged that she might have yelled at Thomas, but testified that she is

generally a "feisty person" who has probably yelled at Black employees and white employees, as well.  (Binkley Dep. at 115:17–22.)

Thomas points to no evidence rebutting that statement, nor any evidence connecting Binkley's decision to move him among units to her role on the hiring committee for Job Postings 2 and 3.  If anything, the addition of Binkley to the hiring committee appears to have improved Thomas's prospects of gaining promotion.  For Job Posting 1, before Binkley was on the hiring committee, Thomas received a score of zero on both KSA 4 and KSA 7.  For Job Posting 2, once Binkley was involved, Thomas received a one on KSA 7, and only KSA 4 prevented Thomas from being interviewed.  Thomas's evidence that Binkley yelled at him and moved him and Saggu around from one unit to another would not permit a reasonable factfinder to conclude that national origin or race animus was at work in the promotion decisions challenged here.  *McDaniel*, 940 F.3d at 367 (internal quotations omitted).[12]

Thomas also points to apparent inconsistencies in Powe's testimony about his training abilities.  For Job Posting 1, the hiring committee gave Thomas a score of zero for KSA 7, "Ability to manage an on-the-job training program."  (Job Posting 1 at 3, 5.)  Powe stated that she felt Thomas's application was misleading in that he claimed he had trained people to operate the forklift and mule machine; she noted that only "craft" employees—not SDOs themselves—are instructed in how to give such training.  (*Id.* at 7; Powe Dep. at 55:4–7, 56:15–22.)  Yet Thomas's application stated that he *was* a "craft" employee from 1994 to 2000.  (Pl.'s SOAF ¶ 6; Powe Dep. at 57:6–58:16.)  Still, while she voiced suspicion about Thomas's claiming to have conducted training, Powe explained that the committee gave Thomas a zero on KSA 7 because "Under his direction, the employees . . . did not receive the training . . . when I [spoke] with some of the

---

[12]    Thomas also testified that, in November 2017, he was denied credit for ten work hours, and he suspects Binkley was responsible.  (Thomas Dep. at 88:2–93:12.)  Without more, such speculation cannot support Thomas's claim.  *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018) ("[O]ur favor toward the nonmoving party does not extend to inferences that are supported by only speculation or conjecture." (internal quotations omitted)).

employees that were assigned to him . . . they did not feel like they had been trained." (Powe Dep. at 54:12–19.)

KSA 7 asks about an applicant's "Ability to *manage* on-the-job training," (Job Application 1 at 3 (emphasis added)), and it is not clear to the court that Powe was, in fact, faulting Thomas for failing to personally train his employees while he was a supervisor when she said that employees did not receive training "[u]nder his direction." She testified that the committee awarded Thomas a zero on KSA 7 because Thomas "lacked the communication skills to conduct the on-the-job training . . . [and] lacked the communication skills when issuing instructions." (Powe Dep. at 72:23–73:9.) Whether or not Thomas was expected or able to provide training himself, Powe appeared to believe that, in his role as a supervisor, he was responsible to ensure that his employees received proper training and had not met that responsibility. Notably, Thomas's poor communication skills resulted in a zero for KSA 4, as well, another barrier to his receiving an interview. (Job Posting 1 at 5.) *See Mullin*, 732 F.3d at 778 ("Where an employer proffers more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons." (internal quotations omitted)).

Finally, Thomas complains that in September 2017, he was stripped of his duties as backup (or "acting") MDO and transferred from Tour 1 to Tour 3. A Black woman who had become an SDO just two years earlier took his place as Tour 1's backup MDO, and Thomas did not regain his title when he was transferred back to Tour 1 a few months later. (Pl.'s Decl. ¶ 4.) There is no evidence of any discriminatory motive behind this decision, however, and Thomas identified no basis for personal knowledge to support his suspicion that he was moved "so that a Black SDO, Rhonda McGinnis . . . could be trained." (*Id.*) To the contrary, Thomas admitted that he did not even know who made the decision to move him, and that when he asked Binkley why he was being moved, she replied, "I don't know . . . The upper managers have made the decision." (Thomas Dep. at 70:8–19.) There appears to be no admissible evidence that the decision to remove Thomas from his role as Tour 1's acting MDO was based on animus, nor any relationship

between that decision and any of the promotion decisions challenged in this lawsuit. As for why Thomas was not restored to his position as acting MDO when he returned to Tour 1 a couple of months later, Thomas himself testified that Binkley had already offered the position to Glenda Bruce and did not feel comfortable rescinding that offer to put Thomas back in the position. (*Id.* at 78:6–21.) Thus, Defendant's revoking Thomas's acting MDO duties also does not support Thomas's claims of discrimination.

## <u>CONCLUSION</u>

Defendant USPS presented legitimate, nondiscriminatory reasons for promoting Binkley, Brown, and Plane instead of Thomas. In short, Defendant argued that these three women were more qualified than Tho187856

mas for their positions. Thomas has failed to show either that he was "clearly more qualified" than any of these three applicants or that other circumstances indicate that Defendant's proffered reasons were pretextual. Defendant DeJoy's motion for summary judgment [32] is granted.

ENTER:

Dated: March 9, 2021

_____

REBECCA R. PALLMEYER
United States District Judge